No. 29,221.

FRANK STANLEY et al., *Appellants*, v. VIRGINIA STANLEY et al., *Appellees*,

and

FRANK STANLEY et al., *Appellants*, v. EALAN STANLEY et al., *Appellees*.

(Consolidated.)

(289 Pac. 406.)

Opinion filed July 5, 1930.

*Floyd W. Hobbs,* of Holton, *A. E. Crane, B. F. Messick* and *A. Harry Crane,* all of Topeka, for the appellants.

*E. R. Sloan, Thomas A. Fairchild, H. R. Fulton,* all of Holton, *J. J. Schenck, C. P. Schenck, Oscar Raines, Ralph F. Glenn* and *Ivah Raines Glenn,* all of Topeka, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: In these two cases, consolidated, the plaintiffs, who were two sons and a daughter of the late Daniel W. Stanley, of Jackson county, sought to set aside deeds executed by him conveying to their stepmother and her son, plaintiffs' half brother, 285 acres of land, comprising practically all the property of the grantor.

The petition alleged that plaintiff Anna Gray was a daughter of Daniel W. Stanley by his first wife; that plaintiffs Frank Stanley and Daniel Stanley were his sons by a second wife; that defendant Virginia Stanley was his third wife; and defendant Ealan W. Stanley was the only son of Daniel W. and Virginia Stanley.

It was alleged that in 1925, when the elder Stanley was about eighty-five years old, he fell and broke his hip, and in 1926 he had a stroke of paralysis, after which he became bedridden, infirm and very weak in body and mind, and unable to sign his name; that while in such condition his wife and youngest son, Virginia and Ealan, defendants herein, conspired to acquire all the property of any value belonging to Daniel W. Stanley and to defraud plaintiffs of their share of their father's estate under the statute of descents. Plaintiffs alleged that to effect that evil purpose defendants procured an attorney to go to the home of the elder Stanley and caused deeds to be executed in favor of·defendants, without consideration, conveying 205 acres to Virginia and 80 acres to Ealan; that at the time of their execution the grantor was under the dominion and control of defendants and could only sign his name by mark, although when in health and younger he could write very well.

Each of the deeds in question bore the date of October 27, 1926, recited a consideration of "one dollar and other considerations," and bore a mark to indicate the grantor's signature. Each deed also contained the names of two witnesses to the grantor's signature and the acknowledgment of a notary public.

The grantor, Daniel W. Stanley, died on April 3, 1928, about seventeen months after the deeds were executed. Following his death these actions were begun. Ere they were tried Virginia

also died, and the action against her was revived in the name of Ealan W. Stanley, her son and heir.

Issues were joined by general denials. The cases were consolidated and tried by the court without a jury. Seventeen witnesses called by plaintiff gave testimony tending to show that at the time the deeds were executed and for some time prior thereto Daniel W. Stanley was too feeble in body and mind to understand the nature of these transactions, and that the execution of the deeds was effected upon the initiative of Ealan Stanley, grantee of one of the deeds and the beneficiary of the other as the sole heir of his mother. On the other hand, some twenty-eight witnesses were called by defendants, and the substance of their testimony was that notwithstanding the advanced age and physical infirmities of Daniel W. Stanley he understood quite well what he was about when he executed the deeds in controversy; that about a year before he had caused deeds to be prepared for the conveyance of these, lands to his wife and youngest son—the only difference being that in those earlier deeds the wife was to receive forty acres less and her son forty acres more than they did by the later deeds which are the subject of attack in this action. Moreover, some weeks after the deeds involved in this litigation were executed the grantor expressed his satisfaction that the matter of disposing of his property had been attended to and in accordance with his wishes. The notary, who was an acquaintance of the elder Stanley of several years' standing, testified:

"I had a conversation with D. W. Stanley possibly a month after these deeds were executed. . . . [He] brought up the matter of these deeds, and he said he wanted those deeds to remain as he had made them out; he discussed the matter quite fully; at some later date Ealan made an application to place a mortgage on the eighty and I discussed the matter of the mortgage with D. W. Stanley; . . . [I] talked to D. W. Stanley and Virginia, his wife, as I wanted to be sure it would be satisfactory, and they both said it was satisfactory to make the loan. This was in the spring of 1928. The last time I had any conversation with D. W. Stanley in regard to business matters was the Friday before he died; he brought up the subject of the disposal of his property and said he wanted the deeds to stand just as he had made them."

It will thus be seen that so far as this lawsuit turned upon the controverted issues of Daniel W. Stanley's capacity to execute the instruments, and whether their execution was of his own volition and not under constraint or undue influence of the grantees or

either of them, the general finding and judgment of the trial court is conclusive. Indeed, the argument in plaintiffs' behalf is not that there was no substantial evidence to support the general finding and judgment, but that the *preponderance* of the evidence was on the side of the plaintiffs. Doubtless plaintiffs sincerely hold to that view, but it is one which was altogether at variance with the evidence to which the trial court gave its credence, and its opinion and judgment must control. (*Sawtelle v. Cosden Oil & Gas Co.,* 128 Kan. 220, 225, 277 Pac. 45; *Osborn v. Coverdale,* 129 Kan. 55, 59, 281 Pac. 897.) With the mere question on which side of a lawsuit the preponderance of evidence inclines the supreme court has nothing to do. In *Farney v. Hauser,* 109 Kan. 75, 83, 198 Pac. 178, a contention that the preponderance of the evidence was on the side of appellants was thus answered:

"But it is said that this finding was greatly against the *weight* of the evidence, and that as this is an equity case we should decide this question of fact for ourselves. Unless the evidence is documentary (*Mathewson v. Campbell,* 91 Kan. 625, 627, 138 Pac. 637) or by deposition (*Record v. Ellis,* 97 Kan. 754, 760, 156 Pac. 712), that is not done and cannot be done by this court, whether the case be one at law or in equity. (*Burlington v. Wagoner,* 100 Kan. 439, 164 Pac. 1057.)"

In *Clothing Co. v. Assurance Co.,* 116 Kan. 377, 380, 226 Pac. 712, it was said:

"What these appellants desire is not a critical examination of some one or more assigned errors committed by the trial court of sufficient gravity to require or justify a reversal of the judgment, but that this court should undertake independently to try these lawsuits *de novo* on the record and give judgment thereon according to our discretion, regardless of the judgment of the trial court. Such a theory of the scope of appellate review is altogether foreign to this jurisdiction. (*Bruington v. Wagoner,* 100 Kan. 439, 441, 164 Pac. 1057; *Upton v. Pendry,* 110 Kan. 191, 203 Pac. 300; *Hayslip v. Insurance Co.,* 112 Kan. 189, 210 Pac. 188; *Nelson v. Railroad Co.,* 116 Kan. 35, 225 Pac. 1065.)"

In *Pittman Co. v. Hayes,* 98 Kan. 273, 277, 157 Pac. 1193, it was said:

"We only have this case in cold type. We have not seen the witnesses. Perhaps the testimony of the defendant and his wife as to the first defense was true. Perhaps the plaintiff's testimony as to the first defense was false. Perhaps the defendant in his weakness framed up the second defense through perjury to meet the plaintiff's perjured testimony on the first defense. We discuss these matters bluntly, and with no purpose of reflecting on either party, but only to point out how impossible it is for an appellate court,

which must gather its facts from the printed page, to substitute its judgment for that of the district court, which gathers its facts from the lips of living witnesses. And thus it is that month by month and year by year, in this court and in other courts of appeal, the elementary rule has to be restated that the decision of the trial court on matters of fact based upon substantial though conflicting testimony cannot be disturbed."

Appellants, however, seek to bring this case under the rule that where a son takes charge of his aged and infirm parent's business affairs his dealings with his father and the manner in which he has transacted his father's business are subject to strict scrutiny. Quite so. Because Daniel W. Stanley had lost the use of his hand and had to sign checks on his banking account by making his mark, at the request of his banker he had given Ealan a power of attorney to sign checks and make disbursements on his father's account. Any transaction involving the drawing of such checks, in which Ealan might possibly have been personally interested, would have been subject to rigid scrutiny under the rule to which appellants refer. It is not easy to see that the rule has any application to the case at bar, but if it has it was fairly met—at least the trial court could so conclude—by the plethora of testimony given by defendants' many witnesses whose credibility may not be questioned in this appeal. So far as concerns the deed to Virginia, there was nothing about this case which required her to justify the gift on the theory of a fiduciary relationship. It would indeed be a hard rule to hold that when a man in failing health and weighted with years conveys the title to his home or home farm to the woman who has been his faithful wife for forty years that the law will impose a burden on her to show that the conveyance was not effected by any improper act or conduct on her part, but was the voluntary and unconstrained act of her husband.

It is also asserted that the elder Stanley had no independent advice. We think he did. It was shown that the conveyance of his lands to his wife and youngest son was no new idea of the grantor. While indeed Virginia was the grantor's third wife, yet she had been his wife for *forty-one years* when these deeds were executed. At various times the elder Stanley had consulted with friends about the disposition of his property. In conversation with a friend of twenty-five years' standing he said, "You know Jennie (Virginia) has been a good wife to me and I want her to have the home place." To another witness he said that Ealan had been a

good and dutiful son and that he had already given more to his other children than he was giving to Ealan. There was no evidence introduced to discount or minimize that statement. The elder Stanley had been a union soldier. Late in October, 1926, several soldier comrades visited him. When ready to leave one of them tarried behind the others to speak of his affairs. He testified:

"I said, 'Dan, I believe I should ask you a question.' He said, 'What is it?' I said, 'You have been sick some time and do not seem to get much better. Have you ever made a will?' He looked at me and laughed and said, 'I am glad you asked me that question. I have had Mr. Sloan (attorney) down here and have fixed my affairs as I want them fixed up.'"

Other testimony to the same effect could be gleaned from the record, but it is needless. We think that the matter of independent advice was abundantly sustained, and the critical question whether the case was one where a showing of independent advice would be requisite to sustain the deeds need not be decided. But see *Golder v. Golder*, 102 Kan. 486, 170 Pac. 803; *Shell v. Mulligan*, 103 Kan. 185, 173 Pac. 286; *Linn v. Blanton*, 111 Kan. 743, 208 Pac. 616; *Harth v. De Shazo*, 112 Kan. 127, 210 Pac. 339; *Stunkel v. Stahlhut*, 128 Kan. 383, 277 Pac. 1023.

No substantial error in the record appears, and the judgment is therefore affirmed.